No. 15-1502

In The

# United States Court of Appeals

### For the

# Seventh Circuit

UNITED STATES *ex rel.* JAMES GARBE,

*Relator-Appellee*,

*v.*

KMART CORPORATION,

*Defendant-Appellant*.

On Interlocutory Appeal from the
United States District Court for the Southern District of Illinois
No. 12-CV-881
The Honorable Nancy Rosenstengel, presiding.

## BRIEF OF RELATOR-APPELLEE

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
KOREIN TILLERY LLC
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
(314) 241-4844

George A. Zelcs
KOREIN TILLERY LLC
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
(312) 641-9750

*Counsel for Relator-Appellee James Garbe*

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-1502

Short Caption: U.S. ex. rel. James Garbe v. Kmart Corp.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

James Garbe

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Korein Tillery, LLC

Phillips & Cohen, LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Aaron M. Zigler              Date: 8/3/15

Attorney's Printed Name: Aaron M. Zigler

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____   **No** ☒

Address: 505 N. 7th Street, Suite 3600

St. Louis, MO 63101

Phone Number: (314) 241-4844              Fax Number: (314) 241-3525

E-Mail Address: azigler@koreintillery.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-1502

Short Caption: U.S. ex. rel. James Garbe v. Kmart Corp.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

James Garbe

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Korein Tillery, LLC

Phillips & Cohen, LLP

(3) If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/  Robert L. King          Date: 8/3/15

Attorney's Printed Name: Robert L. King

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☒   **No** _____

Address: 505 N. 7th Street, Suite 3600
St. Louis, MO 63101

Phone Number: (314) 241-4844          Fax Number: (314) 241-3525

E-Mail Address: rking@koreintillery.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-1502

Short Caption: U.S. ex. rel. James Garbe v. Kmart Corp.

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[ ]**    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

James Garbe

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Korein Tillery, LLC

Phillips & Cohen, LLP

(3) If the party or amicus is a corporation:

  i)  Identify all its parent corporations, if any; and

    N/A

  ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

    N/A

Attorney's Signature: s/ Stephen M. Tillery    Date: 8/3/15

Attorney's Printed Name: Stephen M. Tillery

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____   **No** ✕

Address: 505 N. 7th Street, Suite 3600

St. Louis, MO 63101

Phone Number: (314) 241-4844    Fax Number: (314) 241-3525

E-Mail Address: stillery@koreintillery.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-1502

Short Caption: U.S. ex. rel. James Garbe v. Kmart Corp.

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

James Garbe

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Korein Tillery, LLC

Phillips & Cohen, LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

      N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature: s/ George A. Zelcs       Date: 8/3/15

Attorney's Printed Name: George A. Zelcs

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address: 205 N. Michigan Ave, Suite 1950

Chicago, IL 60601

Phone Number: (312) 641-9750     Fax Number: (312) 641-9751

E-Mail Address: gzelcs@koreintillery.com

rev. 01/15 GA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION ........................................................................................................... 1

STATEMENT REGARDING ORAL ARGUMENT.................................................... 3

JURISDICTIONAL STATEMENT ............................................................................. 4

STATEMENT OF THE CASE...................................................................................... 4

    I.   Kmart's Generic Drug Programs ...................................................................... 5

    II.  The Pharmacy Reimbursement Process and Kmart's False Statements and False Claims ............................................................................................................. 9

SUMMARY OF ARGUMENT .................................................................................... 12

ARGUMENT.................................................................................................................. 13

    I.   The District Court Correctly Held That The 2009 FERA Amendments Apply Retroactively To Relator's § 3729(a)(2) Claims. ................................................. 13

        A    *Allison Engine* and the 2009 amendments to the False Claims Act. .......................... 15

        B.   Section 3729(a)(1)(B) (formerly § 3729(a)(2)) applies retroactively to June 7, 2008. ................................................................................................................... 16

            1.   *Yannacopoulos*, *Thulin* and *Sanford-Brown* control the question of retroactivity and are in accord with the majority of other circuits. ........................ 17

            2.   Claims under the False Claims Act" refers to claims under section 3729(a)(2), not claims for payment. .................................................................... 18

        C.   The Court should vacate its order granting an interlocutory appeal and remand the case for trial. ................................................................................................ 21

    II.  The District Court Correctly Denied Summary Judgment As To Kmart's Pre-2009 False Claims For Reimbursement To Medicare Part D. .................................................. 22

        A.   Medicare Part D claims are paid from government funds, unlike the payments at issue in *Allison Engine*. ............................................................................... 22

        B.   *Allison Engine* Should Not Be Extended To The Medicare Part D Context............. 25

        C.   Plan Sponsors and PBMs are "'officers or employees of the United States" within the meaning of the Medicare statute, so they are "the Government" for purposes of §§ 3729(a)(1) & (2) of the pre-FERA False Claims Act ........................ 27

III. Pharmacy Overcharges Are Quintessential "False Claims" And Are "Material" Within The Meaning Of The False Claims Act................................................. 29

    A.    Kmart's inflated reimbursement claims and false statements about its prices are "material" within the meaning of the False Claims Act ........................................... 30

    B.    The "fixed" nature of the Part D advance payments to Plan Sponsors and PBMs is irrelevant for purposes of the False Claims Act. .................................................... 32

        1.    The 1986 FCA amendments doom Kmart's arguments based on the "fixed" nature of CMS's payments ........................................................ 33

        2.    Relator presented transaction-by-transaction evidence of Kmart's inflated claims and the corresponding amounts Kmart received........................................ 33

        3.    The "risk sharing" feature of the Medicare Part D scheme is a "collateral source" for the Government that does not inure to Kmart's benefit................................................................................................... 35

    IV.  Kmart offered its generic drug program prices to the "general public." ........................... 36

CONCLUSION................................................................................................................... 42

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7)........................................... 43

CERTIFICATE OF SERVICE ............................................................................................. 53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison Engine Co. v. United States ex rel. Sanders*,
553 U.S. 662 (2008) ......................................................14, 15, 16, 17, 18, 20, 22, 25, 26, 27, 29

*Bodimetric Health Servs., Inc. v. Aetna Life & Cas.*,
903 F.2d 480 (7th Cir. 1990) ................................................................................................27, 28

*United States ex rel. Buth v. Pharmerica Corp.*,
No. 09-C-0720, 2014 WL 4355342 (E.D. Wis. Sept. 3, 2014) ................................................34

*Daniel v. Paul*,
395 U.S. 298 (1969) ................................................................................................................38, 39

*Do Sung Uhm v. Humana, Inc.*,
620 F.3d 1134 (9th Cir. 2010) ...............................................................................................28, 29

*Envtl. Def. v. Duke Energy Corp.*,
549 U.S. 561 (2007) .......................................................................................................................20

*Gen. Dynamics Land Sys., Inc. v. Cline*,
540 U.S. 581 (2004) .......................................................................................................................20

*United States ex rel. Head v. Kane Co.*,
798 F. Supp. 2d 186 (D.D.C. 2011) .............................................................................................32

*United States ex rel. Hopper v. Anton*,
91 F.3d 1261 (9th Cir. 1996) ........................................................................................................32

*In re HealthCare Compare Corp. Sec. Litig.*,
75 F.3d 276 (7th Cir. 1996) ..........................................................................................................22

*United States ex rel. Kirk v. Schindler Elevator Corp.*,
601 F.3d 94 (2d Cir. 2010) ............................................................................................................17

*Lindh v. Murphy*,
521 U.S. 320 (1997) .......................................................................................................................19

*McManaway v. KBR, Inc.*,
No. 12-20763, 2013 WL 8359992 (5th Cir. Nov. 7, 2013) ........................................................22

*Midland Psychiatric Assocs., Inc. v. United States*,
145 F.3d 1000 (8th Cir. 1998) .................................................................................................27, 28

*Mikes v. Straus*,
274 F.3d 687 (2nd Cir. 2001)...................................................................................32, 35

*Nesmith v. Young Men's Christian Ass'n of Raleigh, N.C.*,
397 F.2d 96 (4th Cir. 1968) ...........................................................................................39

*Pine Top Receivables of Illinois, LLC v. Banco de Seguros del Estado*,
771 F.3d 980 (7th Cir. 2014) ..........................................................................................37

*Potts v. Rawlings Co., LLC*,
897 F. Supp. 2d 185 (S.D.N.Y. 2012)............................................................................28

*United States ex rel. Rigsby v. State Farm & Cas. Co.*,
No. 14-60160, 2015 WL 4231645 (5th Cir. July 13, 2015)............................................17

*Sanders v. Allison Engine Co.*,
703 F.3d 930 (6th Cir. 2012) ..........................................................................17, 18, 19, 20

*United States ex rel. Spay v. CVS Caremark Corp.*,
913 F. Supp. 2d 125 (E.D. Pa. 2012) .........................................................................11, 12, 35

*United States ex rel. Stephens v. Tissue Sci. Labs., Inc.*,
664 F. Supp. 2d 1310 (N.D. Ga. 2009) ..........................................................................33

*Thulin v. Shopko Stores Operating Co., LLC*,
771 F.3d 994 (7th Cir. 2014) ....................................................................................12, 17

*United States ex. rel. Totten v. Bombardier Corp*,
380 F.3d 488 (D.C. Cir. 2004).......................................................................15, 26, 29, 33

*United States v. Azzarelli Const. Co.*,
647 F.2d 757 (7th Cir. 1981) .......................................................................................3, 33

*United States v. Bruno's Inc.*,
54 F. Supp. 2d 1252 (M.D. Ala. 1999) ..........................................................................38

*United States v. McNinch*,
356 U.S. 595 (U.S. 1958)..................................................................................................2

*United States v. Rogan*,
517 F.3d 449 (7th Cir. 2008) .....................................................................................30, 35

*United States v. Sanford-Brown, Ltd.*,
788 F.3d 696 (7th Cir. 2015) .....................................................................................12, 17

*Voyager 1000 v. C. A. B.*,
489 F.2d 792 (7th Cir. 1973) ..........................................................................................39

*United States ex rel. Yannacopoulos v. Gen. Dynamics,*
    652 F.3d 818 (7th Cir. 2011) ........................................................................12, 14, 17

**Statutes**

31 U.S.C. § 3729 (2000). ...........................................................................................14, 27

31 U.S.C. § 3729 (2009) .......................................14, 15, 16, 17, 18, 21, 22, 25, 29, 30

42 U.S.C. § 405(h) .....................................................................................................28, 29

Fraud Enforcement Recovery Act of 2009
    (FERA), PUB. L. NO. 111-21, 123 Stat. 1617 (2009)..........................13, 14, 15, 16, 18, 20, 21

**Other Authorities**

42 C.F.R. § 423.322 ....................................................................................................11, 35

42 C.F.R. § 423.336 ..........................................................................................................24

42 C.F.R. § 423.343 ....................................................................................................11, 35

45 C.F.R. § 162.1102 ........................................................................................................10

2006 ANNUAL REPORT, BOARDS OF THE FEDERAL HOSPITAL INSURANCE AND FEDERAL
    SUPPLEMENTARY MEDICAL INSURANCE TRUST FUNDS .................................................23

2007 ANNUAL REPORT, BOARDS OF THE FEDERAL HOSPITAL INSURANCE AND FEDERAL
    SUPPLEMENTARY MEDICAL INSURANCE TRUST FUNDS ..............................................2, 23, 24

2014 ANNUAL REPORT OF THE BOARDS OF TRUSTEES OF THE FEDERAL HOSPITAL
    INSURANCE AND FEDERAL SUPPLEMENTARY MEDICAL INSURANCE TRUST FUNDS.............2, 24

BRIEF FOR RESPONDENT THE UNITED STATES OF AMERICA, *Allison Engine Co., Inc.
    v. United States*, 2013 WL 2244321 (U.S.) ...................................................18, 19

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF INSPECTOR GENERAL,
    05-07-00560 CMS AUDITS OF MEDICARE PART D BIDS (Nov. 2008)......................................24

DAN B. DOBBS, PAUL T. HAYDEN AND ELLEN M. BUBLICK, THE LAW OF
    TORTS §482 (2d ed.) ................................................................................................36

FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. 99-345, 21-22,
    1986 U.S.C.C.A.N. 5266 (1986)..............................................................................33

FRAUD ENFORCEMENT & RECOVERY ACT OF 2009, S. REP. NO. 111-10,
    *reprinted in* 2009 U.S.C.C.A.N. 430 .......................................................15, 16, 27

John A. Glen, 14A CORPUS JURIS SECUNDUM, *Clubs*, § 1.......................................21, 39

NCPDP, *Telecommunication Version 5 Questions, Answers And Editorial Updates* (Nov. 2010) ............................................................................................................10

RESTATEMENT (SECOND) OF TORTS § 920A (1979) .......................................................................35

**INTRODUCTION**

This is a *qui tam* whistleblower suit brought by a now-retired Kmart pharmacist, James Garbe. For years, Kmart has fraudulently overcharged public and private health insurance plans, including Medicaid, Tricare and Medicare Part D, for tens of millions of prescriptions sold through Kmart's discount generic drug programs. Under those programs, Kmart sells 30-day, 60-day, and 90-day supplies of most generic drugs to "cash" customers[1] for $5, $10, and $15, yet Kmart charges insurers significantly higher prices for those exact same drugs. For example, Kmart charged cash customers $5 for a 30-day supply of 80 mg Simvastatin (generic Zocor), but charged the government $152.97 for the same prescription. ECF 98 at 50 (¶ 157). Kmart's inflated billing practices have cost the government hundreds of millions of dollars.

Kmart commits this fraud by misrepresenting its "usual and customary" prices for generic drug prescriptions. The "usual and customary" price of a drug, sometimes referred to as the "cash price," is the maximum amount insurers will pay a pharmacy for a prescription. It is defined throughout the health care industry as the price a pharmacy charges a customer who pays out-of-pocket without using insurance. ECF 281 at 20-21. Although nearly all of its cash sales are at or below its $5/$10/$15 generic drug cash prices, Kmart excludes these sales from the "usual and customary" prices it submits to insurers. Instead, Kmart reports list prices that almost no one pays. The reason for Kmart's padding of its "usual and customary" prices is obvious, as is confessed in a startlingly blunt internal Kmart memorandum: it "maximizes our reimbursement from our third party payors." ECF 218-46 at 1. Kmart once estimated the practice was netting it approximately $1 million per week. ECF 218-50 at 1.

---

[1] A "cash customer" refers to someone who pays out of his or her own pocket without insurance. *See* ECF 98 at 2 (¶ 3).

Kmart's overcharges to programs like Medicare Part D, Medicaid, and Tricare violate the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq*. "The False Claims Act was originally adopted" to address practices like "charg[ing] exorbitant prices for goods delivered." *United States v. McNinch*, 356 U.S. 595, 599 (U.S. 1958). As Kmart itself acknowledges, Congress passed the FCA "during the Civil War in response to overcharges and other abuses." Br. at 6.

Kmart does not deny that it charges the government more than its program prices, and instead raises technical defenses. For example, it argues that its overcharges do not constitute a fraud on the Medicare Part D program. According to Kmart, if anyone is defrauded it is private parties: Part D Plan Sponsors and Pharmacy Benefit Managers (PBMs) whom, Kmart says, only receive "some funds" from the government. Br. at 26. That argument, and Kmart's repeated refrain that its inflated billings do not — indeed *cannot* — cost the government money are nonsense.

"The major sources of revenue for the Part D account are (i) contributions of the Federal Government that are authorized to be appropriated and transferred from the general fund of the Treasury, (ii) premiums paid by eligible persons who voluntarily enroll, and (iii) contributions from the States." 2007 ANNUAL REPORT, BOARDS OF THE FEDERAL HOSPITAL INSURANCE AND FEDERAL SUPPLEMENTARY MEDICAL INSURANCE TRUST FUNDS, at 108 (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ReportsTrustFunds/downloads/tr2007.pdf). Moreover, "[t]he premiums established by these plans are heavily subsidized by Medicare," and are "are financed primarily by general revenues." *Id*. at 107. "In calendar year 2006, contributions received from the general fund of the Treasury amounted to $39.1 billion, which accounted for 81.0 percent of total revenue." *Id*. at 109; *cf*. 2014 ANNUAL REPORT, BOARDS OF THE FEDERAL HOSPITAL INSURANCE AND FEDERAL SUPPLEMENTARY MEDICAL INSURANCE TRUST FUNDS, at 103 (https://www.cms.gov/Research-Statistics-Data-and-

Systems/Statistics-Trends-and-Reports/ReportsTrustFunds/downloads/tr2014.pdf) (total federal contributions of $51.0 billion, accounting for 73.1 percent of total revenue). Kmart's argument that its overcharges do not cost the heavily subsidized Part D program money are contrived.

Kmart also contends that since the government has fixed payment arrangements with Sponsors and PBMs, it is immaterial to the government whether pharmacies overcharge for Part D drug reimbursements. Kmart does not cite the case most directly on point on this issue, *United States v. Azzarelli Const. Co.*, 647 F.2d 757 (7th Cir. 1981), even though that case held that because the federal funds at issue were "fixed," the False Claims Act did not apply. Kmart does not cite *Azzarelli* because Congress legislatively overruled it in 1986, statutorily ensuring that the fixed nature of a federal grant would never be a bar to False Claims Act liability.

Kmart also raises an issue not certified for review: whether Kmart's generic drug prices are the "cash price to the general public" under a subset of unspecified state Medicaid statutes. Br. at 4, 39-45. Not only is this argument undeveloped (Kmart does not cite even one statute that allegedly supports its claim), the argument is completely meritless. Kmart's own records show that it charged the supposedly "members only" cash prices for generic drugs in nearly all of its cash transactions. Kmart's claim that its discount generic drug prices were reserved for "enrolled members" is a sham, and the district court's rejection of it is sound. This Court should affirm.

## STATEMENT REGARDING ORAL ARGUMENT

The Court should reconsider its decision to accept this interlocutory appeal. As Kmart itself acknowledges, "[t]his appeal largely, though not exclusively, involves Medicare Part D claims." Br. at 13. The threshold issue in this case is whether Congress's 2009 amendments to the False Claims Act apply here, and aside from the issue of retroactivity, the answer is not even close: the amendments unquestionably apply because the majority of the Part D claims at issue post-date the two effective dates of the relevant amendments, May 20, 2009 and June 7, 2008.

The Medicare Part D program began in 2006, so the number of Part D reimbursement claims Kmart has submitted in the six years since May 20, 2009 vastly exceed the number of Part D claims Kmart submitted in the two-and-a-half years between January 2006 and May 2009. The only issue Kmart raises on appeal not affected by the 2009 amendments is whether Kmart's cash prices for generic drugs were charged to the "general public" or to "enrolled members" who are a separate, distinct group from the general public. That issue, however, is not an issue the district court certified for interlocutory review, and it would clearly have been unsuitable as a stand-alone issue for interlocutory review. All of which is to say that interlocutory review is not warranted in this case, and the Court should dismiss the appeal as having been improvidently granted, as further discussed in Section I(C) below.

If the Court disagrees and proceeds to the merits of the appeal, however, Relator agrees that oral argument is appropriate.

## JURISDICTIONAL STATEMENT

Appellant's jurisdictional statement is complete and correct.

## STATEMENT OF THE CASE

The core allegation in this case is that Kmart has a longstanding practice of overcharging insurance programs, public and private alike, for generic drug prescriptions. In 2007, near the end of his decades-long career as a pharmacist, Relator James Garbe took a job as a pharmacist for a Kmart pharmacy in Ohio. ECF 106-3 at 1 (¶ 3). After he began working for Kmart, Mr. Garbe, a Medicare Part D beneficiary, filled one of his own prescriptions at a competitor's pharmacy. ECF 98 at 48 (¶¶ 148-49). In reviewing the records relating to that prescription, Mr. Garbe noticed a large discrepancy between the amount the other pharmacy submitted to Medicare Part D for the prescription and the amount that Kmart submitted for his earlier, identical prescription. *Id*. at 47-48 (¶¶ 144-49).

Curious about the discrepancy, Mr. Garbe began scrutinizing Kmart's pharmacy reimbursement claims and, to his astonishment, discovered that the discrepancy was not aberrational. *Id*. at 49-50 (¶ 155). Through further investigation, he realized that Kmart routinely charged a lower price to customers who paid for prescriptions out of their own pocket without using insurance, but a higher price whenever an insurer paid for the prescription. *Id*. at 50-51 (¶¶ 156-59). Mr. Garbe also confirmed that Kmart falsely reported inflated "usual and customary" prices for generic drugs whenever it sought payment from a third-party payer like Medicare. ECF 106-3 at 2 (¶¶ 6-7). Skeptical about the legality of Kmart's practice, Mr. Garbe shared his discovery with government investigators before initiating this *qui tam* action in July 2008. *Id*. at 2-4 (¶¶ 8-12).

Mr. Garbe filed this lawsuit on behalf of the federal government under the False Claims Act, twenty-eight states under their respective state-law versions of the False Claims Act,[2] and all private insurers in California and Illinois under insurance fraud prevention statutes in those two states.[3] In the federal count (Count I), Mr. Garbe alleges that Kmart has overcharged all federal healthcare programs offering a prescription drug benefit, including Medicare Part D, Medicaid, and Tricare. ECF 98 at 59-60 (¶¶ 180-82).

## I.    Kmart's Generic Drug Programs

In 2004, Kmart introduced a generic drug program that was initially intended to compete with online, mail order pharmacies. ECF 281 at 5. Kmart dubbed its program the "Kmart Maintenance Program" (KMP) and, as originally conceived, the program offered a discount price of $15 to customers with a 90-day prescription for one of the generic drugs included on Kmart's "formulary" (*i.e.*, its list of covered drugs). *Id*. At the time of the generic drug program's

---

[2] ECF 98 (Counts II, IV-IX, and XI-XXXI).

[3] *Id*. (Counts III and X).

creation, Kmart was fully aware of the "impact" the program's discount prices could have on the company's "usual and customary" prices. ECF 218-4 (49:3-50:16).

By 2006, the Medicare Part D prescription drug benefit had become available to Medicare beneficiaries, creating a vast new source of revenue for pharmacies and intensifying competition among retail pharmacies. For instance, Wal-Mart, one of Kmart's chief competitors, announced the rollout of its own generic drug discount program, offering hundreds of generic drugs to its customers at $4 for a 30-day supply. ECF 218-1 (288:22-289:10). As a result, by late-2005, Kmart had already begun revamping the KMP as it geared up to meet the coming onslaught of retail competition.[4] The trick for Kmart was to remain competitive with other large, retail pharmacies, while simultaneously increasing revenue by reporting higher "usual and customary" prices to insurers.[5]

The first move Kmart made was to change the name of its generic drug program from the "Kmart Maintenance Program" to the "Retail Maintenance Program" (RMP).[6] Kmart claimed internally that the elimination of "Kmart" from the name would place a "firewall" between the program and its "usual and customary" pricing.[7] Kmart also tried to masquerade its program as a "secondary insurance program" so that, from a customer's point of view, it would appear to be like any other pharmacy's generic drug program, while still allowing Kmart to claim to insurers

---

[4] ECF 218-30 ("We need to determine how we can go to market with the KMP program chain wide without eroding [gross profit dollars] from [third party] contract with impact of U&C.").

[5] ECF 218-47 at 1 ("[I]t is financially beneficial to maintain the Usual and Customary price higher than reimbursement rates."); ECF 218-48 at 3 ("[W]e have the increased U&C to drive as much profit as possible out of [third party] programs.").

[6] ECF 218-31 at 17 ("Name change (eliminate Kmart)").

[7] *Id*. ("Name change to place firewall between U&C and unique program"); ECF 218-32 at 1 ("[W]e are re-setting the program, including renaming it to RMP, to put it at a long a possible arms length from our U&C pricing.").

that the program had no effect on its "usual and customary" prices.[8] As Kmart's primary architect of the revamped program explained:

> As we know, the RMP program has been compared to Wal-Mart's $4 generics program and those that have followed suit with Wal-Mart. From a patient's-customer's point of view, this is an appropriate comparison, yet from my world they are completely different initiatives. And when approached from a … payer, we need to be able to differentiate the RMP program from the competition's.

ECF 218-1 (350:1-351:6, quoting an internal Kmart email).

In addition to renaming the program, Kmart also hired a discount prescription drug company named Agelity to "manage" the RMP. ECF 218-1 (348:9-349:2). When insurers (including government programs) would ask Kmart why they were not being charged the program's lower prices,[9] Kmart would claim that the RMP was "secondary insurance" run by a third-party processor (Agelity), who managed the RMP formulary and determined eligibility for the program.[10] Those claims, however, were untrue; Kmart controlled every aspect of its program.[11]

Kmart, not Agelity, managed the RMP formulary. ECF 218-4 (115:7-19). Kmart, not Agelity, decided which drugs were included in the formulary, and Kmart alone determined the prices for those drugs. ECF 218-1 (317:5-22, 327:20-22). Similarly, Kmart, not Agelity, determined a customer's "eligibility" to receive RMP pricing. ECF 218-1 (318:18-319:10). Even the contract between Kmart and Agelity provided that Kmart would supply Agelity with the list of RMP drugs, that the formulary would be "created, maintained, and managed" by Kmart, and

---

[8] ECF 218-37 at 1 ("Not to worry, this is why we setup the RMP program as a customer opt in, secondary insurance program, at arms length from U&C").

[9] ECF 218-33 at 1; ECF 218-34 at 1; ECF 218-35 at 2; ECF 218-4 at 29-30 (113:24-114:16, noting that payers questioned whether they were being billing correctly with respect to Kmart's U&C prices).

[10] ECF 218-38 at 2-3; ECF 218-39 at 1-2; ECF 218-40; ECF 218-41 at 1 ("[I]n effect, RMP is an Agelity program.").

[11] ECF 218-1 at 91 (358:12-359:10, acknowledging that it was a misrepresentation when Kmart described its generic drug program to others as insurance); ECF 218-2 at 32-33 (125:23-126:19, conceding that it was a misrepresentation when Kmart presented the RMP to others as an Agelity program).

that the RMP would be available to "any individual … whom [Kmart] identifie[d] as being eligible for coverage." ECF 218-43 at 1-4. To the extent Agelity served any legitimate function, it was only to "double-check" that a Kmart pharmacist did not make a "mistake" in processing a specific transaction.[12] ECF 218-2 (135:12-20). Even then, Kmart could override Agelity's decisions, and it frequently did so.[13] The real and primary purpose behind Kmart's hiring Agelity was to give the RMP the fictitious appearance of an insurance plan, which is precisely how Kmart falsely portrayed the setup. ECF 218-31 at 17.

In 2008, Kmart expanded its generic drug program to include additional drugs, some of which were explicitly offered at the $5 and $10 prices for 30-day and 60-day supplies respectively. ECF 281 at 6, 33-34 n.11. Kmart's original rationale for limiting the discount pricing to 90-day prescriptions was its recognition that similar discounts on 30-day and 60-day prescriptions would have unquestionably reduced Kmart's "usual and customary" prices for 30-day, 60-day, and 90-day prescriptions to the discounted price. The flipside of Kmart's generic drug pricing as originally conceived, however, was that a prescription for one of the generic drugs on Kmart's formulary that was for a less than 90-day supply would often cost more than the $15 price for a 90-day prescription of the same drug.

Kmart sought to remedy this pricing anomaly in a couple of ways. First, pharmacists were instructed to contact a customer's prescribing physician in an attempt to have 30-day and 60-day prescriptions changed to 90-day prescriptions. ECF 281 at 5. That solution, however, created customer dissatisfaction because of the delays it caused in filling prescriptions. The quickest and

---

[12] In later iterations of its generic drug programs, Kmart contracted with other companies that replaced Agelity but whose functions, to the extent there were any, remained the same. *See* ECF 218-2 at 32 (122:2-123:5).

[13] ECF 218-4 at 37 (142:8-144:10, acknowledging that Kmart likely performed upwards of 20,000 overrides of Agelity per month); ECF 218-44 at 2 ("With the amount of overrides we have, it sounds like we are abusing the programs intent … 20+ % overrides tells me the program is out of control.").

most customer-satisfying solution, of course, was to prorate 30-day and 60-day prescriptions, charging $5 and $10 for them respectively, which is exactly what Kmart did. ECF 218-2 (146:4-147:14); ECF 218-11 at 7. Moreover, Kmart's pharmacists routinely overrode the program pricing in order to match or beat the price of competitors.[14] In fact, it was Kmart's policy to match or beat competitors' prices, offering customers, for instance, 30-day supplies for $4 or less.[15]

In 2009, Kmart further expanded its program by introducing the "Prescription Savings Club" (PSC). Under the PSC, Kmart continued to offer customers low prices on 30-day, 60-day, and 90-day supplies of certain generic drugs, for $5, $10, and $15. ECF 281 at 6. Throughout all iterations of its generic drug programs, however, Kmart's practice for charging insurers like Medicare has remained exactly the same: charging lower prices to cash customers, while charging higher prices — often many times higher — when an insurer was paying.

## II. The Pharmacy Reimbursement Process and Kmart's False Statements and False Claims

Pharmacies submit reimbursement requests for prescription drug sales electronically through a series of intermediaries. ECF 218-5 (21:13-26:15). When a patient presents a prescription coverage identification card to the pharmacy staff at Kmart, it collects identifying information about the patient and her insurance plan. ECF 237 at 6. That information, together with the prescription information (including quantity, cost, and the "usual and customary" charge) is

---

[14] ECF 218-2 at 47 (183:18-184:2); ECF 218-11 at 7; ECF 218-21 at 4 (noting that overrides are "like running a super coupon all the time…and making a profit at the same time"); ECF 218-22 (noting that price matching had been "out of control" in the past because "most price matches were bogus- not being verified- or being done just out of habit"); ECF 218-48 at 5 ("Price matching is a tool we have to offset [our] high U&C pricing.").

[15] ECF 218-24 at 3 (stating that it is Kmart's policy to beat Wal-Mart's $4 price by charging $3.89); ECF 218-21 at 4 ("It is a bait and switch scheme—bait [customers] with the price match to get their business, then sale them the other prescriptions at what their insurance will reimburse us as they are put on more meds.").

transmitted by computer to an intermediary called a "switch" for transmittal to the payer. *Id.* at 4.

The switch routes the information to a Pharmacy Benefit Manager, which determines coverage and calculates the reimbursement amount. *Id.* at 6. The reimbursement is the lower of several amounts, typically a "submitted ingredient cost," "contracted ingredient cost," "submitted dispensing fee," "contracted dispensing fee," or the pharmacy's usual and customary price. *Id.* at 7. A response to the claim is transmitted back to the pharmacy. *Id.* The entire exchange from submission to response takes no more than two to three seconds. *Id.* The processor/PBM later remits the reimbursement to the pharmacy. *Id.* The same electronic submission occurs when the payer is Medicaid or Medicare Part D. *Id.*

This process is governed by a standard protocol developed by the National Council for Prescription Drug Programs (NCPDP). *Id.* at 1-2. NCPDP standards provide for a common format and definition of specific data fields. *Id.* In other words, they ensure that all of the computers involved speak the same language. ECF 218-5 (28:6-18). The government and private insurers therefore require the use of NCPDP standards. *Id.*; *see also* 45 C.F.R. § 162.1102.

NCPDP standards define "usual and customary" to mean the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed." ECF 218-63 at 74. "The Usual and Customary Charge (426-DQ) represents the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer." *Telecommunication Version 5 Questions, Answers & Editorial Updates*, at 39 (Nov. 2010).

When the prescription is paid by Medicare Part D, summary data called a Prescription Drug Event (PDE) is transmitted from the Plan Sponsor to Centers for Medicare & Medicaid Services (CMS). ECF 281 at 9. When the usual and customary price of the drug is the lowest of the

reimbursement limits, it will be reported on the PDE as the price paid (in Field #27). MEDICARE PART D PDE DATA ELEMENTS (https://www.cms.gov/Medicare/Prescription-Drug-Coverage/ PrescriptionDrugCovGenIn/downloads/PDEDataElements.pdf). Part D Plan Sponsors who fail to submit required claims-level information contained in a PDE to CMS risk having to return monthly payments to CMS during reconciliation. 42 C.F.R. § 423.343(b), (c)(2) & (d)(2); 42 C.F.R. § 423.322; *see also United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 152 (E.D. Pa. 2012).

Relator hired a pharmaceutical economist, Dr. Joel Hay, who analyzed Kmart's transaction data identifying all of its sales of prescriptions available under its generic drug programs, matched each of those sales with a corresponding payment from the government, and compared those sales to Kmart's cash sales of the same drugs. *See* ECF 218-11 and 238. Dr. Hay then calculated Kmart's usual and customary prices based on the actual amounts Kmart charged to customers who purchased drugs without insurance; identified each instance in which Kmart reported an overstated amount; and calculated damages to government programs, measured as the difference between what these programs paid and what they would have paid if Kmart had charged them its generic drug program prices. ECF 218-11 at 2. That analysis showed that Kmart charged nearly all cash-paying customers the program prices. *Id*.

Relator also retained an auditor who, based on her experience in the industry, testified that because the prices under Kmart's generic drug programs were the lowest prices that Kmart offered for those drugs, under industry practice and the terms of Kmart's own contracts (of which she reviewed more than 1,000), Kmart should have submitted its program prices as its usual and customary prices. ECF 218-9 at 15. Kmart's transaction data showed that Kmart instead reported much higher prices and was reimbursed at a rate substantially higher than the

11

prices it charged cash-paying customers. ECF 218-11 at 2.

## SUMMARY OF ARGUMENT

1. The district court correctly held that the 2009 FERA amendments apply retroactively to Relator's § 3729(a)(2) claims. This Court has held that the 2009 amendment to that section contains an explicit retroactivity provision making it retroactive to June 7, 2008, to claims under the False Claims Act.*United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818 (7th Cir. 2011); *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994 (7th Cir. 2014); *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696 (7th Cir. 2015).

2. The district court correctly denied summary judgment as to Kmart's pre-2009 false claims for reimbursement to Medicare Part D. To the extent the pre-FERA version of the FCA applies at all, it only applies to Kmart's conduct before June 7, 2008 (under former section 3729 (a)(2)), or May 20, 2009 (under former sections 3729(a)(1)). The district court correctly denied Kmart's summary judgment with respect to those claims because: 1) Medicare Part D claims are paid with government money; and 2) Plan Sponsors and PBMs are "'officers or employees of the United States" within the meaning of the Medicare statute, and should be deemed to be "the government," satisfying the pre-FERA "presentment" requirement for purposes of §§ 3729(a)(1) & (2) of the pre-FERA False Claims Act.

3. Pharmacy overcharges are quintessential "false claims" and are by their nature "material" within the meaning of the False Claims Act. Just as Plan Sponsors and PBMs should be deemed to be "the government" for pre-FERA "presentment" purposes, they are also "the government" for pre-FERA "materiality" purposes. The 2009 amendments dispose of any such requirement as part of the "materiality" element; a false claim or statement is "material" if it is "material" to a recipient of federal funds that are intended to be used for a government program.

12

Moreover, the "fixed" nature of the Part D advance payments to Plan Sponsors and PBMs is irrelevant for purposes of the False Claims Act. Congress amended the FCA in 1986 to ensure that the fixed nature of a federal grant would be no bar to FCA liability. Relator also produced evidence of millions of Kmart's reimbursement claims and receipts that demonstrate Kmart's false reimbursement claims resulted in the diversion of over $100 million in Medicare Part D funds to Kmart. The "risk sharing" feature of the Part D program, in which Plan Sponsors and PBMs share the risk of losses with the government, is a collateral source that inures to the government's benefit, not Kmart's. Thus, to the extent that this risk sharing arrangement prevented Kmart's fraudulent diversion of Medicare Part D funds to itself from causing the government to pay out even more money than it otherwise would have, that does not diminish Kmart's liability nor does it render its false claims and statements "immaterial."

4. The price a pharmacy charges to a majority of its cash customers is its usual and customary price. Nearly all of Kmart's cash customers paid its discount prices, but Kmart did not submit those prices as usual and customary on the grounds that it did not offer those prices to the "general public." Kmart fails to cite a single statute that supports its argument, and case law uniformly rejects such transparent attempts to construct a private "club" to skirt laws of general applicability.

## ARGUMENT

### I. The District Court Correctly Held That The 2009 FERA Amendments Apply Retroactively To Relator's § 3729(a)(2) Claims.

Prior to Congress's enactment of the Fraud Enforcement Recovery Act of 2009 (FERA), PUB. L. NO. 111-21, 123 Stat. 1617, the False Claims Act imposed civil liability on:

> Any person who—
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or

13

fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

31 U.S.C. §§ 3729(a)(1) & (2) (2000). Despite the pre-FERA Act's broad definition of a "claim" (*see* 31 U.S.C. § 3729(c) (2000)), some courts had interpreted section 3729(a)(1) to require *direct* "presentment" to the government; indirect presentment of a false claim or statement to a recipient of federal funds had been held insufficient. Some courts had also interpreted subsection (a)(2) as requiring that the false claim be paid from government funds; again, despite the expansive definition of "claim," payment from funds that had originated with the government was not enough. The Supreme Court adopted such an interpretation in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008). Kmart moved for summary judgment contending that Relator could not establish this presentment requirement under either pre-FERA subsections (a)(1) or (a)(2), and it relied on *Allison Engine* in support of that argument.

Less than a year after *Allison Engine* was decided, however, Congress amended the False Claims Act *retroactively* overruling that decision "to reflect the original intent of the law." PUB. L. No. 111-21, § 4, 123 Stat. 1617, 1625 (2009). Significantly, as this Court has recognized, Congress specifically made the amendments to one of the provisions at issue here — § 3729(a)(2) — retroactive to June 7, 2008, two days before *Allison Engine* was decided. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011) ("the amendment to section 3729(a)(1)(B) [formerly § 3729(a)(2)] … applies to cases, such as this, that were pending on or after June 7, 2008"). Because FERA is retroactive, the district court correctly held that Kmart was not entitled to summary judgment with respect to its false claims for reimbursement from Medicare Part D prior to the applicable effective dates of FERA.

**A.** *Allison Engine* **and the 2009 amendments to the False Claims Act.**

Section 4 of FERA legislatively overruled *Allison Engine* and similar decisions. Section 4 is titled "Clarifications To The False Claims Act To Reflect The Original Intent Of The Law." PUB. L. NO. 111-21, § 4, 123 Stat. 1617, 1621. "This section amends the FCA to clarify and correct erroneous interpretations of the law that were decided in *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008), and *United States ex. rel. Totten v. Bombardier Corp*, 380 F.3d 488 (D.C. Cir. 2004)." FRAUD ENFORCEMENT & RECOVERY ACT OF 2009, S. REP. NO. 111-10 at 10, *reprinted in* 2009 U.S.C.C.A.N. 430, 438.

The amendments eliminated the "language from section 3729(a)(1), which requires a false claim be presented to 'an officer or employee of the Government, or to a member of the Armed Forces.'" S. REP. NO. 111-10 at 11, 2009 U.S.C.C.A.N. at 438-39. Similarly, the amendments removed from section 3729(a)(2) the "paid or approved by the Government" language at issue in *Allison Engine*. Thus, since FERA's enactment on May 20, 2009, the text of those two sections (renumbered as §§ 3729(a)(1)(A) & (B)) has provided:

> … any person who—
>> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> is liable to the United States Government for a civil penalty … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C § 3729(a)(1). A "claim" is now defined as any request for "money … to be spent or used … to advance a Government program …," if the United States Government … provided any portion of the money or property requested." 31 U.S.C § 3729(b)(2)(A). Although the text of FERA itself leaves no room for doubt about Congress's intentions, the Senate Report reinforces

the point. *See* S. REP. NO. 111-10 at 11, 2009 U.S.C.C.A.N. at 433, 438-39. Congress enacted FERA specifically to foreclose any argument that a private entity that distributes government funds on behalf of the government is not "the government" for purposes of the FCA. That is precisely the argument Kmart advances on appeal based on the pre-FERA version of the Act. The district court correctly rejected Kmart's arguments, and this Court should affirm.

**B. Section 3729(a)(1)(B) (formerly § 3729(a)(2)) applies retroactively to June 7, 2008.**

Section 4(f)(1) of FERA expressly provides that "subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect *as if enacted on June 7, 2008*," — two days before *Allison Engine* was decided — "and apply to *all claims under the False Claims Act* (31 U.S.C. §§ 3729 *et seq.*) that are pending on or after that date." PUB. L. NO. 111-21, § 4(f)(1) (emphasis added). In other words, only the amendment to former section 3729(a)(2) was retroactive to June 7, 2008; all other amendments were effective on the date of enactment, May 20, 2009. By making the amendment to section 3729(a)(2) retroactive to two days prior to *Allison Engine*, Congress intended FERA to overrule *Allison Engine* completely, as if it had never been on the books.

Despite the express retroactivity language of FERA, a circuit split has developed over the meaning of section 4(f)(1). Kmart contends, and some courts have held, that the word "claims" in section 4(f)(1) refers to the "false claims" a defendant submits for payment, as opposed to the "claims" relator has made in a case. While there are a number of reasons that Kmart's reading of the statute is untenable, the first hurdle that Kmart faces is this Court's precedent: three times this Court has said that section 4(f)(1) applies to False Claims Act *cases*.[16]

---

[16] It bears noting that even were the Court to accept Kmart's argument that the phrase "claims *under the False Claims Act*" means claims for payment, the only Part D claims that would be affected would be those that remained unpaid between January 1, 2006 (the day the Part D program went into effect) and

### 1. *Yannacopoulos*, *Thulin* and *Sanford-Brown* control the question of retroactivity and are in accord with the majority of other circuits.

In *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818 (7th Cir. 2011), the Court stated that "the amendment to section 3729(a)(1)(B) [now § 3729(a)(2)] … applies to cases, such as this, that were pending on or after June 7, 2008." *Id*. at 822 n.2. Although Kmart dismisses *Yannacopoulos* as non-binding dictum, Br. at 46-47, this Court has twice cited and applied *Yannacopoulos* as authoritative. In *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994 (7th Cir. 2014), which Kmart does not mention, the Court held "[t]he current version of another provision of the FCA … 'applies to cases such as this, that were pending on or after June 7, 2008' …." *Id*. at 998 (quoting *Yannacopoulos*). Similarly, in *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696 (7th Cir. 2015), the Court reiterated its view on retroactivity, again citing *Yannacopoulos*:  "Although the 2009 amendments only applied on a prospective basis, Congress specified that § 3729(a)(1)(B) applied to all FCA claims pending on or after June 7, 2008." *Id*. at 701 n.1; *see also id*. at 701-02 & n.1 ("Because this action was filed well after June 7, 2008, count II of Nelson's first amended complaint is based exclusively on 31 U.S.C. § 3729(a)(1)(B) (the successor to § 3729(a)(2))," where violations began in 2006).

Kmart's suggestion that there is no binding precedent on the issue in this Circuit lacks merit. The retroactivity rule followed in this Circuit not only comports with the majority rule,[17] it is

---

June 7, 2008. Relator's (a)(2) claims for the vast majority of Kmart's Part D reimbursements, from June 7, 2008, to the present, would all be controlled by the 2009 amendments to subsection (a)(2).

[17] *See Sanders v. Allison Engine Co.*, 703 F.3d 930 (6th Cir. 2012); *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94 (2d Cir. 2010). Kmart also counts the Fifth Circuit on its side (Br. at 48, citing *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 & n.4 (5th Cir. 2012)), but as the Sixth Circuit noted in *Sanders*, "[t]he Fifth Circuit appears to have taken both positions." *Sanders*, 703 F.3d at 940 (citing both *Gonzalez* and *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010)). Recently, he Fifth Circuit has again held the amendment to be "retroactively applicable to … [a] false record count" pending on June 7, 2008. *United States ex rel. Rigsby v. State Farm & Cas. Co.*, No. 14-60160, 2015 WL 4231645, at *18 (5th Cir. July 13, 2015).

also consistent with *Sanders v. Allison Engine Co.*, 703 F.3d 930 (6th Cir. 2012), the only circuit decision that has carefully examined the issue.

### 2. "Claims under the False Claims Act" refers to claims under section 3729(a)(2), not claims for payment.

An allegedly false claim for payment submitted by a defendant to the government is not a claim "under the False Claims Act;"  it is a claim for payment. The government and *qui tam* relators, not FCA defendants, make claims *in lawsuits* "under the False Claims Act." "[S]ubstituting the technical definition of 'claim' into the phrase 'claims under the False Claims Act' makes little sense because a request for payment is never effectively made under the FCA." *Sanders*, 703 F.3d at 938.

Kmart points to FERA § 4(b)(2)(A), which amends the definition of "claim" to "mean[] any request or demand, whether under a contract or otherwise, for money or property." The definition of "claim" contained in section 4(b)(2)(A) of FERA is part of the "definitions" section of the False Claim Act, and is codified at 31 U.S.C. § 3729(b) as amended. Those definitions are limited to their usage in section 3729 — "[f]or purposes of this section" — meaning section 3729 of the False Claims Act. *See* BRIEF FOR RESPONDENT THE UNITED STATES OF AMERICA, *Allison Engine Co., Inc. v. United States*, 2013 WL 2244321 (U.S.), 12-13 ("Section 4(f)(1) of FERA does not appear in 31 U.S.C. 3729, and the statutory definition of 'claim' accordingly does not apply.")

Moreover, as *Sanders* points out, "if the specific definition of 'claim' in § 3729 is applied to the use of the word in § 4(f)(1) of FERA, the substitution yields a somewhat nonsensical result." 703 F.3d at 938.

> Inserting the definition of "claim" from § 3729 into § 4(f)(1) would result in the following:  subparagraph (B) of section 3729(a)(1) of title 31 … as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all *request[s] or demand[s], whether under contract or otherwise, for money or*

> *property* … under the False Claims Act … that are pending on or after that date. *See* FERA § 4(f)(1); 31 U.S.C. § 3729(b)(2)(A) (2012) (emphasis added to inserted definitional language). This insertion, which juxtaposes the definition normally given to a request to the government for payment with the language "under the False Claims Act," a statutory remedy pursued after an allegedly false claim is made, demonstrates the misfit between the definition and its placement in § 4(f)(1).

*Id*. at 938 n.4 (emphasis in original). And as the government has pointed out, "[u]se of the FCA definition of 'claim' to construe FERA's effective-date provision would create a further anomaly." BRIEF FOR RESPONDENT, *supra*, 2013 WL 2244321, at 13 n.5 ("it would be necessary to determine *which* FCA definition of 'claim' — the pre-FERA definition … or new 31 U.S.C. 3729(b)(2)(A) as added by FERA"). Kmart's contention that "claim" in section 4(b)(2)(A) of FERA means the same thing it means in section 3729 of the FCA because that is what "claim" means in section 3729 is an unpersuasive tautology.

Kmart also points out that section 4(f)(2) of FERA contains a retroactivity provision that makes some of the amendments applicable "to cases pending on the date of the enactment." Kmart maintains that this demonstrates that Congress knew "how to refer 'cases' when it intended to." Br. at 47-48. That argument invokes a familiar rule of construction: "where a statute includes 'particular language in one section … but omits it in another section of the same Act,' it leads to the general presumption that the 'disparate inclusion or exclusion' was done 'intentionally and purposely.'" *Sanders*, 703 F.3d at 936 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). That "familiar rule" is at its "strongest when the portions of a statute treated differently had already been joined together and were being considered simultaneously when the language raising the implication was inserted." *Lindh v. Murphy*, 521 U.S. 320, 330 (1997). That is not what happened here. *See Sanders*, 703 F.3d at 937. "Because the two provisions governing exceptions to the general effective date of FERA's amendments to the FCA were not drafted simultaneously, the inference that a difference in language signifies a different

intention on the part of Congress is weak, despite the general presumption that Congress deliberately chose the difference." *Id.*

The rule is also merely a general rule of construction, not an unyielding command. "There is, then, no 'effectively irrebuttable' presumption that the same defined term in different provisions of the same statute must be interpreted identically. Context counts." *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 575-76 (2007) (internal quotation marks and citation omitted). "The presumption of uniform usage thus relents when a word used has several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation, without being confused or getting confusing." *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595-96 (2004); *accord Sanders*, 703 F.3d at 937.

Moreover, understanding "claims under the False Claims Act" to mean claims made by the government or relators under section 3729(a)(2) or "under the False Claims Act" is the only understanding of section 4(f)(1) that gives effect to Congress's unmistakable intent to overrule *Allison Engine*. If Kmart's interpretation were adopted, then the amendment of section 3729(a)(2) would apply to claims for payment that remained unpaid on or after June 7, 2008, which also yields a nonsensical result. It would leave *Allison Engine*'s section 3729(a)(2) holding intact with respect to those FCA cases pending on or after June 7, 2008, if they involved claims for payment that had been paid on or before June 6, 2008. That reading of FERA's retroactivity provision renders the June 7, 2008 date entirely arbitrary. Congress could have chosen any retroactive date and it would make no less sense than the date Congress actually selected. Kmart's interpretation of section 4(f)(1)'s retroactivity is not a reasonable one and should be rejected.

**C. The Court should vacate its order granting an interlocutory appeal and remand the case for trial.**

As Relator explained in his opposition to Kmart's petition for interlocutory review, retroactivity is a threshold issue in this appeal. The linchpin of Kmart's arguments on all three questions the district court certified depends on the application of pre-FERA law. In section I, Kmart contends that "the pre-FERA FCA expressly requires presentment to the Government." Br. at 25 (heading "A"). Similarly, in section II, Kmart contends that "Relator must have proof of materiality *to the Government*," echoing the "presentment" argument Kmart makes in Section I. Br. at 32 (heading "A"; emphasis added). In section IV, Kmart maintains that "Relator cannot establish any pre-FERA § 3729(a)(2) violations under Medicare Part D." Kmart's arguments fail, however, if the FERA amendment to former § 3729(a)(2) applies to a case such as this that was pending on or after June 7, 2008.

Kmart's challenges to the viability of Relator's claims in sections I and IV of its brief are strictly limited to those claims that pre-date the two applicable effective dates (June 7, 2008, and May 20, 2009) of the 2009 FERA amendments. The FCA violations at issue involved Kmart's conduct both before and after FERA's two effective dates. By challenging only those claims based on pre-FERA conduct, Kmart effectively concedes it was not entitled to summary judgment on the claims for Medicare Part D reimbursements that Kmart submitted "on or after June 7, 2008" (governed by the current section 3729(a)(1)(B)). Similarly, Kmart also effectively concedes it was not entitled to summary judgment on the claims for Medicare Part D reimbursements that Kmart submitted on or after May 20, 2009 (governed by the current section 3729(a)(1)(A)). *See* Br. at 31, 50-51. Kmart's false claims for Medicare Part D reimbursement since either of those two dates constitute the lion's share of the Part D reimbursement claims at issue. *See* ECF 218-11, 238.

21

The only other issue Kmart has raised on appeal (Br. at 39, Section III) is not one that the district court certified for interlocutory review.

> Where the merits panel has reason to believe that the motions panel would choose to reconsider the petition in light of intervening circumstances or other defects in its ability to make a fully informed jurisdictional determination, it is appropriate for the merits panel to reexamine the Section 1292(b) issue.

*In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996); *McManaway v. KBR, Inc.*, No. 12-20763, 2013 WL 8359992, at \*1 (5th Cir. Nov. 7, 2013) (Appellate court "may vacate its order accepting appellate jurisdiction, relinquish jurisdiction, and remand the case to the district court").

The district court's retroactivity ruling is consistent with three decisions of this Court, with the holdings of most circuits, and with the government's views. Relator respectfully submits that Kmart's petition was improvidently granted and the order granting it should be vacated.

## II. The District Court Correctly Denied Summary Judgment As To Kmart's Pre-2009 False Claims For Reimbursement To Medicare Part D.

To the extent the pre-FERA version of the False Claims Act applies at all, it only applies to Kmart's conduct before June 7, 2008 (under former section 3729 (a)(2)), or May 20, 2009 (under former section 3729(a)(1)). Kmart's arguments lack merit even under the pre-FERA versions of the False Claims Act.

### A. Medicare Part D claims are paid from government funds, unlike the payments at issue in *Allison Engine*.

In 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act (MMA), offering for the first time "an optional drug benefit to Medicare beneficiaries." U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF INSPECTOR GENERAL (HHS OIG), 02-07-00460, MEDICARE PART D SPONSORS: ESTIMATED RECONCILIATION AMOUNTS FOR 2006, at 1 (Mar. 2011) (http://oig.hhs.gov/oei/reports/oei-02-07-00460.pdf). Beginning in 2006, "Part

D provides subsidized access to drug insurance coverage on a voluntary basis for all beneficiaries and premium and cost-sharing subsidies for low-income enrollees." 2006 ANNUAL REPORT, BOARDS OF THE FEDERAL HOSPITAL INSURANCE AND FEDERAL SUPPLEMENTARY MEDICAL INSURANCE TRUST FUNDS, at 1 (https:// www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ ReportsTrustFunds/downloads/tr2006.pdf).

CMS "contracts with private insurance companies, known as Part D sponsors, to provide prescription drug coverage for beneficiaries who choose to enroll in the program." ESTIMATED RECONCILIATION AMOUNTS FOR 2006, at 1. "[B]eneficiaries obtain the drug benefit by voluntarily purchasing insurance policies from private stand-alone drug plans or through private Medicare Advantage health plans." 2007 ANNUAL REPORT (*supra*), at 107.

"The major sources of revenue for the Part D account are (i) contributions of the Federal Government that are authorized to be *appropriated and transferred from the general fund of the Treasury*, (ii) premiums paid by eligible persons who voluntarily enroll, and (iii) contributions from the States." *Id*. at 108 (emphasis added); *see also id*. at 112 ("Generally, the income to the Medicare Prescription Drug Account will include the beneficiary premiums described above and transfers from the general fund of the Treasury that will be established annually to match each year's anticipated incurred benefit costs and other expenditures."). "The premiums established by these plans are heavily subsidized by Medicare," and are "are financed primarily by general revenues." *Id*. at 106-07.

"CMS contracts with sponsors to provide the Medicare Part D benefit." ESTIMATED RECONCILIATION AMOUNTS FOR 2006, at 2.

> Before the beginning of the plan year, sponsors are required to submit a bid for each plan they intend to offer. Each sponsor submits a "standardized bid," which is an estimate of the average monthly revenue the sponsor needs to provide the basic benefit per beneficiary. This bid is based on the sponsor's anticipated drug

costs, as well as the sponsor's administrative costs and expected profit. … CMS reviews this information and determines whether to approve the final bid. CMS then calculates the national average monthly bid from all plans' standardized bids.

*Id.* at 2-3. "CMS uses the national average monthly bid and the plan's standardized bid to calculate each plan's beneficiary premium." *Id.* at 3. "CMS makes monthly prospective payments to sponsors for providing prescription drug coverage to Medicare beneficiaries. These payments are based on estimates that sponsors provide in their approved bids prior to the beginning of the plan year." *Id.* at i. "After the close of the plan year, CMS reconciles these prospective payments with the actual costs incurred by the sponsors." *Id.* at 4.

"The MMA established risk corridors to allow the Federal Government and plan sponsors to share the profits and losses associated with providing the benefit." HHS OIG, 05-07-00560, CMS AUDITS OF MEDICARE PART D BIDS, at 4 (Nov. 2008) (http://oig.hhs.gov/oei/reports/oei-05-07-00560.pdf). "For each year, CMS establishes a risk corridor for each Part D plan." 42 C.F.R. § 423.336(a)(2)(i). As a result of these risk sharing arrangements, "CMS may owe money to the sponsor or the sponsor may owe money to CMS." CMS AUDITS OF MEDICARE PART D BIDS, at 5. In 2006, for example, "plan sponsors owed CMS an estimated net total of $2.74 billion as a result of risk-sharing payments for plan year 2006." *Id.*

The upshot is that one of the primary services Part D Plan Sponsors provide is distribution of Medicare Part D trust funds to pay for participating Part D beneficiaries' prescription drugs. Kmart says the funds that Plan Sponsors and PBMs disburse to pharmacies "may include some funds derived from the government's advance monthly payments." Br. at 26. Kmart's slant is extremely misleading. As explained above, the funds that Plan Sponsors and PBMs use to pay pharmacy claims not only include "*some* fund derived from the government's advance monthly payments"; those payments constitute the overwhelming majority of those payments. 2007 ANNUAL REPORT, at 108.

**B. *Allison Engine* Should Not Be Extended To The Medicare Part D Context.**

Unlike the Part D payment structure here, *Allison Engine* involved a Navy contract with shipbuilders and shipyards to build a new fleet of destroyers. 553 U.S. at 665. The shipyards subcontracted with Allison Engine to build component parts for over 50 destroyers. *Id.* at 665-66. "The Navy paid the shipyards an aggregate total of $1 billion for each new destroyer." *Id.* at 666. The shipyards, in turn, paid Allison Engine $3 million for each of the component parts it supplied. *Id.* "All of the funds used to pay [Allison Engine] ultimately came from the Federal Treasury." *Id.*

The false claims at issue in *Allison Engine* were claims for payment submitted by subcontractors to the shipyards, and the shipyards paid the subcontractors for their work out of the funds the Navy paid to the shipyards for the ships. Because the shipyards were not "the Government," the Court viewed that situation as simply one in which "a private entity … make[s] payments using money obtained from the Government." 553 U.S. at 672. The Court analogized it to "a federal employee who receives all of his income from the Government" paying for a "new car or a vacation." *Id.* at 669-70. When a federal employee makes such a purchase, it would be inaccurate to "say that the Federal Government had footed the bill," even though all the money used to make those purchases "ultimately" came from the Government.[18] *Id.* at 670. As the Supreme Court saw it, when the government paid the general contractors for their shipbuilding services, that money then became the general contractors' money. Therefore, when the contractor pays its subcontractors with some of that money it is no longer the government's money, even though it originally came from the government.

---

[18] FERA eliminated this possibility by specifically excluding from the definition of "claim" any claim on the "money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property." 31 U.S.C. § 3729(b)(3)(B).

The other case on which Kmart relies, *United States ex. rel. Totten v. Bombardier Corp*, 380 F.3d 488 (D.C. Cir. 2004), was also not a Medicare case. *Totten* involved false claims submitted to Amtrak. It is thus little surprise that "a majority of courts have refused to extend the holding in *Totten* to the Medicaid/Medicare context." ECF 281 at 45 (collecting cases).

> Amtrak was not an intermediary; it had autonomy to pay whatever claims it liked without government involvement. This is obviously different from claims for reimbursement under the Medicare Part D program. … The PBMs or Plan Sponsors are intermediaries; they do not have the same sort of independence as Amtrak did in *Totten*. The fixed monthly amount that the government pays to the Plan Sponsors is paid to them for disbursement purposes only, so that the money may pay for Medicare Part D prescription drugs. Medicare Part D is based upon a comprehensive funding and reimbursement structure between the federal government and insurance companies, and it is different from the federal funding mechanism for Amtrak contracts.

*Id*. at 46. The district court thus refused Kmart's invitation to extend the *Totten* and *Allison Engine* holdings to Medicare Part D claims. *Id*.

Given the completely different structure of the Medicare Part D context from the Navy contract and Amtrak contexts in which *Allison Engine* and *Totten* were decided, this Court would have to extend those holdings in order to apply them here. The district court refused to do so, and so should this Court, particularly in view of Congress's legislative overruling of those decisions. Indeed, over twenty years before *Allison Engine* was decided, Congress expressly contemplated that the broad language it employed in the 1986 amendments would cover the very kind of situations presented here.

> [T]he question has arisen whether claims under the Medicare and Medicaid programs are claims "upon or against the Government of the United States or any department or officer thereof." Under the Medicare program, claims are not submitted directly to the Federal agency, but rather to private intermediaries— usually insurance companies—which are subsequently reimbursed by the United States. However, false Medicare claims have been uniformly held to be within the ambit of the False Claims Act, though the claims were actually filed with, and paid by insurance companies.

S. REP. NO. 99-345 at 21-22, 1986 U.S.C.C.A.N. at 5286-87 (citations omitted). That description of the Medicare program is virtually identical to the way Medicare Part D operates as well. The principal difference is that the government *advances* payments to insurance companies under Part D, whereas it reimburses insurance companies after the fact in other parts of the Medicare program.

Kmart offers no cogent reason for treating Medicare Part D differently than other parts of the Medicare program. There is none. Inflated claims submitted to Part D are false claims to the program, and they are a violation of the False Claims Act, before and after the passage of FERA. The district court should accordingly be affirmed.

**C. Plan Sponsors and PBMs are "'officers or employees of the United States" within the meaning of the Medicare statute, so they are "the Government" for purposes of §§ 3729(a)(1) & (2) of the pre-FERA False Claims Act.**

Even if the *Allison Engine* rule were still good law, it would not bar the claims here where the claims at issue were presented to "the government." Unlike the shipyards in *Allison Engine*, Medicare Part D Plan Sponsors and PBMs who make disbursement decisions are deemed to be "officers or employees" of the United States for purposes of Medicare law, specifically with regard to the very disbursement decisions at issue in this case.

Under the Medicare program, Congress has charged private entities with "serv[ing] a public function." *Bodimetric Health Servs., Inc. v. Aetna Life & Cas.*, 903 F.2d 480, 488 (7th Cir. 1990). Under Medicare Part B, for example, "claims are processed by Medicare carriers — chiefly insurance companies — under contract with and on behalf of the Department of Health and Human Services." *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1002 (8th Cir. 1998). This Court held in *Bodimetric* that in their role as fiscal intermediaries, private insurance companies serve as federal officers or employees.

> This conclusion holds good for Medicare carriers as well. Carriers are governmental agents. Under contract with the Secretary of Health and Human Services, they do the work of the Government on the Secretary's behalf.

*Midland Psychiatric*, 145 F.3d at 1003-04 (citations omitted).

In both *Bodimetric* (involving Medicare Part A) and *Midland* (Part B), the issue was whether a private entity, who "serve[s] a public function" in the administration of the Medicare program, is "an 'officer or employee' of the United States" within the meaning of 42 U.S.C. § 405(h), and thus immune from suit under the Medicare Act. *Bodimetric*, 903 F.2d at 488. Using language strikingly similar to that of the pre-FERA False Claims Act, § 405(h) "precludes actions brought 'against the United States, the Secretary, or any officer or employee thereof.'" *Id*. at 487. In *Bodimetric*, this Court rejected the plaintiff's argument that Aetna did "not serve as an 'officer or employee' of the United States." *Id*. Likewise in *Midland*, the Eighth Circuit affirmed the district court's holding that "as a Medicare carrier, Mutual [of Omaha Insurance Company] is an officer or employee of the United States." *Midland*, 145 F.3d at 1003.

Section 405(h) also applies to Part D Plan Sponsors and PBMs for the same reasons. In making Part D benefits decisions — deciding whether to pay a pharmacy's reimbursement requests — they act as "officers or employees" of the United States within the meaning of § 405(h) and are therefore entitled to the immunity it confers. "Although section 405(h) only bars federal jurisdiction over actions against the United States, the Secretary, or any officer or employee thereof, courts have consistently held that [§ 405(h)] applies to actions against otherwise private entities that contract with CMS under Medicare Parts C and D." *Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 191 n.2 (S.D.N.Y. 2012) (collecting cases).

The Ninth Circuit addressed the section 405(h) issue in *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134 (9th Cir. 2010), and it held that Medicare Part D providers are entitled to the immunity that section 405(h) bestows on "officers or employees" of the United States. Indeed,

the Ninth Circuit held that section 405(h) grants immunity not only against the Part D provider (Humana Health Plan, Inc.) but also against that provider's parent company (Humana, Inc.), which was *not* such a provider. *Id*. at 1138, 1140-41 n.11 & accompanying text (citing *Bodimetric* and *Midland*).

The same "public functions" that render a Part D Plan Sponsor or a PBM an "officer or employee" of the government for purposes of 42 U.S.C. § 405(h) immunity should render them "the government" for the limited purpose of the pre-FERA versions of 31 U.S.C. § 3729(a)(1) and (a)(2). Although Kmart derides this reasoning as an "analogy to non-FCA case law," Br. at 15, the "non-FCA" statute is *the Medicare Act*. Kmart does not contest that Part D Plan Sponsors and PBMs are "officers or employees" of the United States for purposes of § 405(h) immunity under the Medicare Act. Kmart offers no reason for treating them as such for purposes of the Medicare Act but not for purposes of the FCA. The district court should accordingly be affirmed.

### III. Pharmacy Overcharges Are Quintessential "False Claims" And Are "Material" Within The Meaning Of The False Claims Act.

Kmart repackages its *Allison Engine* and *Totten* "presentment" arguments as a materiality argument, claiming its false claims and statements were not "material" to CMS. That argument, however, ignores the dispositive impact of the FERA amendments.[19] Post-FERA, every time Kmart made an inflated request for Part D reimbursement, it was requesting money that the federal government provided and that was "to be spent or used … to advance a Government program," 31 U.S.C § 3729(b)(2)(A), in violation of the False claims Act. If the false claim or statement was material to a PBM or Plan Sponsor's payment to Kmart, then it was "material" within the meaning of the FCA since at least May 20, 2009.

---

[19] Kmart does not contest that FERA applies to all of Kmart's Medicare reimbursement claims submitted since at least May 20, 2009, FERA's effective date.

Even more to the point, Kmart indisputably caused a dollar-for-dollar damage to the Medicare Part D program each and every single time it received a Medicare Part D reimbursement in excess of Kmart's "usual and customary" price for a drug. The fact that the government would have spent those dollars in other ways in the Part D program does not change the fact that Kmart diverted those government dollars to itself. The issue isn't whether the government laid out *additional* money as a result of Kmart's false claims, but whether Kmart *received more* government money than it was entitled to receive.

## A. Kmart's inflated reimbursement claims and false statements about its prices are "material" within the meaning of the False Claims Act.

The False Claims Act explicitly defines the term "material." To be material, a false claim need only be "*capable of influencing*, the payment *or receipt* of money or property." 31 U.S.C. § 3729(b)(4) (emphases added); *see also United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) ("a 'statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed"'"). Kmart agrees that this definition of materiality is applicable here, Br. at 32 (citing § 3729(b)(4) and *Rogan*), and does not contend that the pre- and post-FERA definitions differ in any respect significant to the present case.

There is no genuine dispute that Kmart's overcharges for prescriptions and its false statements of its "usual and customary" prices were either "capable of influencing" a PBM or Plan Sponsor's payment of Kmart's claims for reimbursement or "capable of influencing" Kmart's "receipt of money," namely its receipt of Medicare Part D funds. To the contrary, Kmart's own records demonstrate that its overcharges and false statements were not only "capable of influencing[] the payment or receipt of money" to Kmart, but *in fact resulted* in the overpayment of millions of Part D reimbursement claims amounting to over $100 million. ECF

30

218-11 at 2, 11-12. Myopically focused on the phrase "payment … of money," Kmart wholly ignores its own "*receipt* of money," which independently establishes materiality within the meaning of the statute.

Kmart makes no argument that its inflated reimbursement claims did not affect the payment decisions of PBMs and Plan Sponsors. Indeed, Kmart concedes as much. Kmart argues that its inflated claims were not material to *the government* (*i.e.*, CMS) because they "could only impact the profits of a private entity." Br. at 34; *see id*. at 32 (district court "found that the materiality element was met solely because Kmart's allegedly inflated prices presumably caused the PBMs to pay Kmart more than they otherwise would have"). That argument, however, is merely a recycled version of Kmart's flawed "presentment" argument. It therefore fails for the same reasons discussed in Section II. Plan Sponsors and PBMs are "the government" for FCA purposes.

Kmart's argument also fails at the very least with respect to Kmart's post-FERA claims for Part D reimbursement because (as discussed above) FERA legislatively overruled the judicially-engrafted "presentment" requirement. Presentation of a false claim to a "recipient" of federal funds is indisputably sufficient post-FERA because Congress eliminated the language courts had misconstrued as requiring presentment to the actual government directly.

The FCA's definition of "material" does not require that a claim or statement be "capable of influencing the *government's* payment … of money or property." The introduction of a non-statutory requirement that an agency (or officer or employee) of the United States Government be the decision maker would repeat the same interpretive mistake Congress corrected in 2009 with respect to "presentment."

Moreover, overcharging the government for goods or services is an "archetypal," "paradigmatic" violation of the False Claims Act. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996); *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 197 n.13 (D.D.C. 2011). Kmart's reimbursement claims are actionable, and thus "material," simply because Kmart knowingly asked for too much money from Medicare. "There is FCA liability when a 'provider knowingly asks the Government to pay amounts it does not owe.'" *Mikes v. Straus*, 274 F.3d 687, 695 (2nd Cir. 2001) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)).

## B. The "fixed" nature of the Part D advance payments to Plan Sponsors and PBMs is irrelevant for purposes of the False Claims Act.

A recurrent theme throughout Kmart's brief is that its inflated reimbursement requests are not "material" because "given the fixed [nature of CMS's] monthly payments under Medicare Part D, CMS would have paid out 'the same amount of money had Kmart not committed the alleged fraud.'" Br. at 33. Relator acknowledges, as did the district court (ECF 281 at 48) that CMS may well have paid the same amount of money to *PBMs or Plan Sponsors* if Kmart had not committed the fraud, but Kmart's argument misses that point entirely. As the district court explained:

> [T]he government (acting through the PBMs and Plan Sponsors) would not have paid *Kmart* the same amount of money. If the PBM would not have distributed this extra money to Kmart, it would have gone back to the Plan Sponsor. Thus, the false claim that was allegedly submitted was material because it gave the "particular impression" that Kmart was entitled to more money than it should have been entitled, thereby producing an "effect," *i.e.* Kmart receiving more government Medicare Part D funds than it was entitled to receive. The allegedly inflated U&C price had the "ability to effect the government's actions" when it caused the PBMs and Plan Sponsors *to pay Kmart more than Kmart was entitled to receive*.

*Id.* (emphasis added). The district court was right.[20]

### 1. The 1986 FCA amendments doom Kmart's arguments based on the "fixed" nature of CMS's payments.

In *United States v. Azzarelli Const. Co.*, 647 F.2d 757 (7th Cir. 1981), this Court "held that because the federal funds at issue were … 'fixed['] … the False Claims Act did not apply." *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 495 (D.C. Cir. 2004). But as *Totten* (ironically) recognized, Congress "clearly intended to overrule" *Azzarelli* with the 1986 amendments. *Id.*

> [In *Azzarelli*], the court held that because the Federal contribution to highway construction was a fixed sum rather than open-ended (as is the case with Medicare and Medicaid), the Federal Government could not sue the contractors who had engaged in a bid-rigging conspiracy. … Thus, the Committee intends the new subsection (d) to overrule *Azzarelli* and similar cases which have limited the ability of the United States to use the act to reach fraud perpetrated on federal grantees, contractors or other recipients of Federal funds.

FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. 99-345, 21-22, 1986 U.S.C.C.A.N. 5266, 5287 (1986). Since at least 1986, "the fixed nature of a federal grant would be no bar to a claimant's liability." *Id.* Kmart's "fixed payments" argument is thus meritless.

### 2. Relator presented transaction-by-transaction evidence of Kmart's inflated claims and the corresponding amounts Kmart received.

Relator demonstrated that Kmart's overbillings resulted in its receipt of more Part D funds than it was entitled to receive. Contrary to Kmart's insinuations, Relator provided, and the district court had before it, evidence of Kmart's overcharges and inflated receipts, consisting of a transaction-by-transaction expert analysis of the tens of millions of overcharges Kmart submitted

---

[20] Kmart's reliance on DRG cases like *United States ex rel. Stephens v. Tissue Sci. Labs., Inc.*, 664 F. Supp. 2d 1310 (N.D. Ga. 2009), is similarly misguided. As *Stephens* explained, in such cases the "itemized costs on the claim submitted to Medicare are irrelevant *because the hospital receives a fixed fee under the PPS system.*" *Id.* at 1318. (emphasis added); *id.* ("the itemized charges on a patient's bill are immaterial to the amount of reimbursement a provider receives"). By contrast, Kmart's false claims result in Kmart receiving inflated Part D reimbursements.

to Medicare Part D. *See* ECF 218-11. That analysis tracked Kmart's Part D reimbursement requests and the amounts Kmart received for each such request. The reimbursement process, as described earlier, is an automated, electronic one. *See* ECF 237. The inflated reimbursements Kmart received from PBMs and Plan Sponsors were paid with Medicare Part D funds. Proof of what Kmart submitted and what it was paid for each submission thus establishes the necessary "causal link" as well as "materiality."

Kmart insists that Relator should be required to produce evidence of the PBMs' or Plan Sponsors' dealings with CMS with respect to those tens of millions of electronic prescription drug transactions in order to satisfy the materiality element of Kmart's false claims. According to Kmart, Relator should have been required to produce proof of PDE records submitted to CMS, payments by CMS to the Plans, or by the Plans to the PBMs in order to establish "materiality." Br. at 32-33. Indeed, Kmart argues it was "a departure from this Court's precedent" for the district court to "conclude[] that Relator did not need any evidence of demands for payment from, or decision making by, CMS to establish the materiality of his FCA claims." Br. at 32.[21]

The reason the district court did not require such proof from Relator was that it was not necessary. Even beyond Relator's transaction-by-transaction analysis, there can be no serious doubt that Kmart's inflated reimbursement claims were submitted to the government and resulted in Kmart's receipt of inflated reimbursements. Federal law requires Part D Plan Sponsors to transmit those claims to CMS in the form of PDEs, and Sponsors who fail to submit required claims-level information contained in a PDE to CMS risk having to return monthly payments to

---

[21] Kmart also cites *U.S. ex rel. Buth v. Pharmerica Corp.*, No. 09-C-0720, 2014 WL 4355342 (E.D. Wis. Sept. 3, 2014), and the government's brief in that case, for the proposition that a PDE submitted to CMS is a "claim" in a Part D transaction. Relator does not disagree nor did the court below. But Kmart's conclusion that a PDE is the *only* "claim" in a Part D transaction does not follow. *Pharmerica* did not so hold, the government did not espouse that view, and the conclusion is at odds with the FCA's expansive definition of "claim."

CMS during reconciliation. 42 C.F.R. § 423.343(b), (c)(2) and (d)(2); 42 C.F.R. § 423.322; *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 152 (E.D. Pa. 2012). "Testimony from a claims-processing officer along the lines of 'I follow the law' is not required." *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008)

The district court properly concluded that Kmart's false claims to PBMs and Plan Sponsors constitute overcharges to Medicare Part D and are therefore unlawful requests for "'the Government to pay amounts it does not owe.'" *Mikes*, 274 F.3d at 695. In short, they are classic overcharges, and thus intrinsically material, "false claims" within the meaning of the False Claims Act.

### 3. The "risk sharing" feature of the Medicare Part D scheme is a "collateral source" for the Government that does not inure to Kmart's benefit.

Kmart also argues that it is immaterial that its false claims divert more Part D money to Kmart than Kmart is entitled to receive because CMS would have spent that money elsewhere. That is entirely irrelevant. It is not Kmart's prerogative to fraudulently divert federal funds to itself and then claim that its fraud is "immaterial" because the government would have spent the money anyway. The point is, regardless of what else the government might have done with the extra money, it would not have paid it to Kmart.

The only reason Kmart's inflated claims might not cause the government to pay out even more than it already pays to PBMs and Plan Sponsors is a result of the government's collateral, risk-sharing arrangements with PBMs and Plan Sponsors. It is hornbook law that "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." RESTATEMENT (SECOND) OF TORTS § 920A (1979).

> Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the

defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. *But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. … One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives.*

*Id*. at cmt. B (emphasis added); *accord* DAN B. DOBBS, PAUL T. HAYDEN AND ELLEN M. BUBLICK, THE LAW OF TORTS § 482 (2d ed.) ("compensation from 'collateral sources' is none of the defendant's business and does not go to reduce the defendant's obligation to pay damages").

Thus, to the extent a PBM or Plan Sponsor shares in the government's risk of loss from inflated pharmacy claims, that risk-sharing arrangement represents a collateral source of the government, which does not inure to Kmart's benefit.

## IV. Kmart offered its generic drug program prices to the "general public."

As CMS has explained, "where a pharmacy offers a lower price to its customers throughout a benefit year, this … is not considered a one-time 'lower cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse on the basis of this price."[22] ECF 106-2 (CMS Manual, ch. 14 at 19 n.1). But when Kmart submitted its claims for reimbursement for drugs available under its generic drug programs, it claimed a "usual and customary" price that failed to account for the largest segment (nearly all) of its "cash" (out-of-pocket) sales and, instead, reflected simply the greatest amount Kmart believed would be reimbursed. *See* ECF 218-11 at 7-8; ECF 218-62 at 1 ("U&C is always higher than the generic programs pricing.").

Kmart and its *amicus* argue that unspecified state Medicaid statutes define "usual and customary" as the cash price "to the general public." According to Kmart, the "general public"

---

[22] State Medicaid statutes and regulations are in accord, generally defining usual and customary as the price charged to any segment or the largest segment of the pharmacy's cash paying patients. *See* ECF 218-13 (collecting statutes).

phrase necessarily excludes its generic drug programs because those programs represented a special club into which its customers "enroll" and thereby become what Kmart calls "a particular group." Br. at 40. Members of this "particular group" are distinct from the "general public" as that term is supposedly used in the unspecified state Medicaid statutes. *Id*. Kmart contends it should have been granted summary judgment on "all claims except those for which the relevant U&C definition includes discount program member pricing." Br. at 43.

Kmart has not cited a single state Medicaid statute or regulation that supports its argument. Instead, Kmart offers its mere *ipse dixit*: "It follows then that, where the definition of U&C turns on the price to the general public, the special pricing offered to that subset of enrolled customers falls outside the U&C." Br. at 41. Kmart does not even bother to identify any state statute under which "the definition of U&C turns on the price to the general public." It does cite, however, three statutes that "explicitly cover enrollment programs like Kmart's," requiring the prices offered as part of such programs to be included in the determination of "usual and customary" prices. *See* Br. at 41-42. According to Kmart, because some states explicitly require inclusion of program pricing in any determination of "usual and customary" prices, any other states' statutes "where the definition of U&C turns on the price to the general public" do not require inclusion of program pricing in any determination of "usual and customary" prices. Kmart cites no authority for such a novel method of "statutory interpretation," which is especially innovative in that it purports to interpret unidentified statutes in a vacuum.

Kmart's argument, of course, is not genuine statutory interpretation. It is waiver. By failing to cite the statutes "where the definition of U&C turns on the price to the general public," Kmart has waived any arguments about the meaning of such statutes. *Pine Top Receivables of Illinois,*

*LLC v. Banco de Seguros del Estado*, 771 F.3d 980, 987 (7th Cir. 2014) (finding waiver where "there is no actual citation to McCarran Ferguson in [Pine Top's] briefs … to the district court.").

Waived or not, Kmart's "enrollment" defense is meritless. The phrase "general public" has been interpreted in the drug price context to mean the largest segment of the patient population that does not receive assistance from third-party payers. *See United States v. Bruno's Inc.*, 54 F. Supp. 2d 1252, 1257-58 (M.D. Ala. 1999). ("'[G]eneral public' refers to customers paying the prevailing retail price, and does not include those covered by third-party payers such as Blue Cross-Blue Shield.").[23]

As an analysis of Kmart's own data shows, nearly every time Kmart sold a prescription included one of its generic drug programs, it was for an amount less than it billed the government for the same prescription. ECF 218-11 at 8-9. Kmart's "generic drug club" constituted the largest segment of Kmart's cash business and falls squarely within the industry understanding of "cash price to the general public" and thus "usual and customary."

Kmart is not the first business that has sought to skirt the law by labeling itself a private club, and courts have uniformly rejected such attempts. Whether they are adult entertainment clubs seeking to avoid zoning ordinances or swimming pools trying to exclude racial minorities in violation of the Civil Rights Act, the result has been the same: unless the organization can show that it is truly selective of its membership, it will be found to be open to the "general public," subject to all of the associated legal obligations.

For instance, in *Daniel v. Paul*, 395 U.S. 298 (1969), the Lake Nixon resort claimed it was allowed to discriminate because it was a private club and therefore not a public accommodation subject to the Civil Rights Act. *Id.* at 301. Lake Nixon required patrons to pay a 25-cent

---

[23] *See* ECF 218-13 (collecting statutes).

membership fee, and it issued membership cards entitling cardholders to enter the Club's premises for an entire season; on payment of specified additional fees, members could use the swimming, boating, and miniature golf facilities. The Court found this alleged "membership" a subterfuge because its facilities were open to all members of the (white) general public. *Id*. at 301-02.

In *Nesmith v. Young Men's Christian Ass'n of Raleigh, N.C.*, 397 F.2d 96 (4th Cir. 1968), the issue was whether the YMCA was a place of public accommodation subject to the Civil Rights Act. The YMCA claimed it was a private club not open to the public. *Id*. at 101. The court noted some of the trappings of a private club:  an application for membership, a membership committee, substantial annual dues of between $30 to $100, and a membership card. *Id*. The court nevertheless found that YMCA's claims were "manifestly untenable, because the YMCA was open to any individual who could afford the yearly membership, and the YMCA held itself out to all members of the community. *Id*.

The critical factor in determining whether a purported "club" is private or public is whether the club's membership is truly selective. *See* John A. Glen, 14A CORPUS JURIS SECUNDUM, *Clubs*, § 1 (citing cases). An organization that admits members based upon objective, and not subjective, criteria may not be considered a private club, and admission to a club and its entertainment that is indiscriminately granted to any member of the public upon payment of a prescribed amount does not confer the status of a private club. *Id*.; *see also Voyager 1000 v. C. A. B.*, 489 F.2d 792, 801-02 (7th Cir. 1973) ("despite the various labels Voyager attaches to itself and to various aspects of its method of operation, it is furnishing transportation by air to the general public").

Kmart has admitted that anyone was eligible to join its generic drug "clubs" or as Kmart now prefers to call them "particular groups." As Kmart's counsel argued: "the second legal question is, Is an enrollment-based program a price — a cash price to the general public? Yes. It's open eligibility. Anyone who walks into the Kmart pharmacy or the Kmart store can choose to walk to the back and to the pharmacy and to enroll in the program. Anyone can choose to enroll, but not everyone is automatically enrolled." ECF 252 (64:1-7); *see also* ECF 114 at 14 (¶ 35) ("any self-paying customer was eligible to participate" in the RMP); ECF 218-6 (13:5-15, stating that the RMP was open to anybody shopping at Kmart). There is no evidence that Kmart ever denied anyone "membership" in any of its generic drug programs. ECF 183 at 18 (¶ 36); ECF 218-2 (105:6-10); ECF 218-6 (16:20-24).

To "enroll," customers were asked to provide standard demographic information (*e.g.*, their name, address, and phone number) that any pharmacy would require to fill a prescription. ECF 218-2 (80:11-20); ECF 218-53 (requiring PSC customers to simply sign and date an enrollment authorization sheet). Moreover, not every customer even completed an enrollment form, since pharmacists or technicians sometimes filled out the form or permitted a customer to "enroll" verbally. ECF 218-2 (77:4-23); ECF 218-8 (69:10-17). Verbal enrollment merely consisted of a pharmacist asking customers if they wanted to "enroll" in Kmart's generic drug program. ECF 218-2 (105:12-24). As a result, Kmart's so-called "enrollment process" was no different than other pharmacy transactions, in part because there is no difference between asking customers if they want to enroll and asking customers if they would prefer to pay a lower price. ECF 218-2 (107:24-108:7).

Moreover, Kmart advertises its generic prices to the general public, and encourages all its customers to "join." ECF 218-2 (89:13-20, 110:9-111:5); ECF 218-4 (119:3-120:17); ECF 218-

49 ("RMP should be utilized to attract all customers."). Case law uniformly rejects claims like Kmart's claim that its generic discount program constitutes any sort of private "club" or "particular group" distinct from the general public. Simply requiring an application or charging membership fees is not enough to create a "club" or group that is separate and distinct from the general public.

Kmart contends that the cases Relator has cited for their analyses of what constitutes "the general public" are inapposite because they do not arise in the prescription drug context. Br. at 43. But Kmart offers no principled reason for distinguishing them. Their analysis and reasoning about what constitutes "the general public" apply across a host of commercial settings, and there is no reason for not applying the same analysis and reasoning here.

Finally, Kmart argues that whether its generic drug prices must be reported as its "usual and customary" prices (under these unspecified state statutes) is a jury question that the district court improperly usurped. Kmart argued just the reverse below. ECF 252 (23:11-16; "Kmart's program is an enrollment-based program … it was not the price to the general public [a]nd … this is an important question of law that the Court has to determine up front."). As Kmart requested, the district court answered that question. And as Kmart presented the question — whether the "enrollment" and other alleged features of its programs separate "enrolled" customers as a "particular group" distinct from "the general public" — it presented no factual dispute for a jury to resolve. That legal question called for a yes or no legal answer, and the district court did not invade the province of the jury simply because Kmart does not like the answer the court gave. The district court should be affirmed.

## CONCLUSION

For the foregoing reasons, the order granting Kmart's petition should be vacated or,

alternatively, the district court should be affirmed and the case remanded for further proceedings.

Dated:  August 3, 2015

/s/ *Robert L. King*

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
KOREIN TILLERY LLC
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Tel: (314) 241-4844
Fax: (314) 241-3525

George A. Zelcs
KOREIN TILLERY LLC
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Tel: (312) 641-9750
Fax: (312) 641-9751

***Counsel for Relator-Appellee***

**CERTIFICATE OF COMPLIANCE**

I hereby certify as follows:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,832 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in Times New Roman 12-point font for the main text and 11-point Times New Roman text for the footnotes.

Dated:  August 3, 2015

/s/ *Robert L. King*
Robert L. King
KOREIN TILLERY LLC
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Tel: (314) 241-4844
Fax: (314) 241-3525

*Attorney for Relator-Appellee*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Robert L. King*
Robert L. King
KOREIN TILLERY LLC
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Tel: (314) 241-4844
Fax: (314) 241-3525

**Attorney for Relator-Appellee**